# United States Court of Appeals for the Federal Circuit

2006-1188


HYDRIL COMPANY LP,
and HYDRIL U.K. LTD.,

Plaintiffs-Appellants,

v.

GRANT PRIDECO LP and GRANT PRIDECO, INC.,

Defendants-Appellees,

and

ATLANTIC RICHFIELD COMPANY,

Defendant.


Michael Hawes, Baker Botts L.L.P., of Houston, Texas, argued for plaintiffs-appellants. With him on the brief were Mitchell Lukin and David M. Rodi.

William J. Boyce, Fulbright & Jaworski L.L.P., of Houston, Texas, argued for defendants-appellees. With him on the brief were Gerard G. Pecht and Paul Krieger.

Appealed from: United States District Court for the Southern District of Texas

Judge Nancy F. Atlas

# United States Court of Appeals for the Federal Circuit

2006-1188

HYDRIL COMPANY LP,
and HYDRIL U.K. LTD.,

Plaintiffs-Appellants,

v.

GRANT PRIDECO LP and GRANT PRIDECO, INC.,

Defendants-Appellees,

and

ATLANTIC RICHFIELD COMPANY,

Defendant.

_____

DECIDED:     January  25, 2007

_____


Before MAYER, Circuit Judge, FRIEDMAN, Senior Circuit Judge, and BRYSON, Circuit Judge.

Opinion for the court filed by Senior Judge FRIEDMAN, in which Circuit Judge BRYSON joins.  Dissenting opinion by Circuit Judge MAYER.

FRIEDMAN, Senior Circuit Judge.

This appeal challenges the district court's dismissal, under Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a valid claim for relief, of a complaint alleging that the defendant (1) monopolized two product markets by enforcing a patent that had been obtained by fraud on the Patent and Trademark Office, (2) infringed a different patent that the appellant owns, and (3) breached a contract between the

parties.    We reverse the dismissal of the antitrust and patent claims, vacate the dismissal of the state law claim, and remand for further proceedings.

I

A.    Industry Background.    According to the second amended complaint, the appellants Hydril Company L.P. and Hydril U.K. Ltd. (collectively "Hydril") manufacture threaded connections for interlocking lengths of drill pipe used in drilling oil and gas wells.    Pls.' 2nd Am. Compl. ¶¶ 8-14.    Hydril does not itself make drill pipe, but outside the United States it sometimes sells finished drill pipe that uses its connections and pipe manufactured by someone else.    Id. ¶ 15.    The appellee Grant Prideco, Inc. ("Grant Prideco") manufactures and sells both drill pipe and its own line of connections.    Id. ¶ 16.

Hydril generally sells its connections to drill pipe distributors "who are assembling finished drill pipe for an end-user," id. ¶ 14, which "typically" is a drilling contractor or a major oil company.    Id. ¶ 10.    "Finished drill pipe is usually specially manufactured to meet an order from the end-user."    Id.    This case involves drill pipe whose diameter is 5 ⅞–inches—a product that, Hydril alleges, has "unique characteristics" for certain types of drilling.    Id. ¶¶ 18-28.

B.    The Antitrust Claim.    This claim involves Grant Prideco's United States Patent No. 6,244,631 ("the '631 patent"), which covers a combination of raw pipe with specified diameters and connections that fit such pipe.    Id. ¶¶ 31-33.

Paragraph 57 of the complaint encapsulates the antitrust claim as follows:

> Under the theory of Walker Process Equipment, Inc. v. Food
> Machinery & Chemical Corp., 382 U.S. 172 (1965), Grant
> Prideco has violated Section 2 of the Sherman Act by
> obtaining and maintaining market power in the relevant

markets by use of threats to enforce a patent that Grant Prideco knew was procured by fraud.

The alleged fraud was that "[d]uring the application process for the '631 patent, Grant Prideco failed to disclose to the USPTO material prior art of which Grant Prideco was aware." Id. ¶ 35. The complaint referred to various items of prior art that Grant Prideco failed to disclose, id. ¶¶ 38-40, and stated:

> The '631 Patent as issued would not have been granted to Grant Prideco had Grant Prideco not omitted from its disclosures such known information on the prior art, including its own prior sales of covered technology.

Id. ¶ 43.

The complaint further stated that "Grant Prideco's concealment of prior art from the USPTO continued even after the '631 Patent issued" and that Grant Prideco's "filing for reissue with disclosure of only selective prior art was also an attempt to practice fraud on the USPTO." Id. ¶ 44.

The complaint described the "relevant [product] markets" as "(1) the market for connections used with 5 ⅞–inch outer diameter pipe; and (2) the market for finished 5 ⅞–inch drill pipe." Id. ¶ 45. It stated that the "relevant [geographic] markets" for both products were "worldwide." Id. ¶ 46.

The complaint alleged that

> Grant Prideco has obtained and maintained its market power in the relevant markets by wrongfully threatening to enforce the '631 Patent against other market participants, including connections manufacturers, drill pipe distributors, and end-users. Grant Prideco has obtained a dominant position in the sale of connections of all practically-functional sizes for use with 5⅞–inch drill pipe, making a substantial portion of all sales of connections for such use. Similarly, Grant Prideco dominates the 5⅞–inch drill pipe market . . . Grant

Prideco makes a substantial portion of all sales of finished 5⅞–inch drill pipe worldwide.

Id. at ¶ 47.

Finally, the alleged "use of threats to enforce a [fraudulently procured] patent" was that

> Grant Prideco has widely publicized the existence of the '631 Patent to the industry in general, and also has directed communications to particular industry participants suggesting that Grant Prideco would act aggressively to challenge activities that it saw as potentially infringing. For example, on January 29, 2003, Grant Prideco's outside patent counsel wrote a letter to OMSCO, a drill pipe distributor that holds license rights to manufacture Hydril's Wedge Thread™ tool joints. The letter asserted that certain orders from OMSCO's customers for 5 7/8-inch pipe with 7-inch tool joints may violate the '631 Patent. The orders referenced were presumably from the end-use drilling contractor Atwood Oceanics, which was copied on letter. The letter suggested that OMSCO take action to "ensure that [Grant Prideco's] patent rights are being respected" in connection with OMSCO's sales of drill pipe. Grant Prideco's letter was intended and understood to be a threat to OMSCO to refrain from sales of 5 7/8-inch drill pipe. On information and belief, Grant Prideco also communicated a similar message asserting its patent to others in the pipe and drilling industries, including Diamond Offshore, Tuboscope, and Riteco.

Id. ¶ 48.

C. The Breach of Contract and Patent Infringement Claims. These claims arise out of the following allegations in the complaint: "Grant Prideco has breached a technology licensing agreement with Hydril and violated Hydril's patent rights over 'wedge thread' technology," which is "a technology developed by Hydril for making high-torque connections between neighboring pieces of pipe, tubing, or conduit." Id. ¶¶ 63-64. Hydril's United States Patent Reissue No. 34,467 ("the '467 patent") covers some of that technology. Id. ¶ 65.

In the late 1980s, former Hydril employees with extensive knowledge of Hydril's wedge thread technology left the company and founded XLS Holding, Inc. and XL Systems, Inc. (collectively, "XLS"). After XLS "began marketing wedge thread connections without a license to use Hydril's intellectual property[,] Hydril sued XLS for misappropriation of trade secrets and know-how, and for patent infringement. That lawsuit settled in 1994 on confidential terms, with Hydril receiving an equity stake in XLS. Following, and as part of the settlement, XLS focused its wedge technology activities on large-diameter connections (20 inches and over), and Hydril focused its wedge technology activities on smaller-diameter connections (less than 20 inches)." Id. ¶ 66.

"In August 1997, the owners of XLS (including Hydril) sold the equity of the company to an affiliate of Grant Prideco. ('Merger Agreement'). Grant Prideco and its other affiliates had never before offered wedge thread technology. Accordingly, in connection with the transaction, Hydril, Grant Prideco, and various related entities executed a license sharing agreement known as the Wedge Thread License Agreement ('Wedge Agreement')," id. ¶¶ 67-68, which the record shows was an exhibit to the Merger Agreement and which both Hydril and Grant Prideco signed.

"Under the Wedge Agreement, Hydril granted Grant Prideco the exclusive right to use Hydril's existing intellectual property, including the protected know-how and trade secrets, on wedge technology to make large-diameter connections, thus allowing Grant Prideco to essentially continue XLS's large-diameter business."

"In exchange, Grant Prideco granted Hydril the exclusive license to use XLS's wedge thread patents, trade secrets, and know-how to make smaller-diameter connections."

"Under the exclusivity provisions of the Wedge Agreement, Grant Prideco is restricted from using the licensed intellectual property and know-how from its large-diameter business to develop smaller-diameter connections. Similarly, Hydril is restricted from using the licensed intellectual property or know-how from its smaller-diameter business to develop large-diameter connections."

"Under [those provisions] either party could develop products in the other's field, so long as it did so completely independently of the intellectual property and know-how of its existing business." Id. ¶¶ 70-73.

"Grant Prideco has materially breached its obligations under the Wedge Agreement by improperly disclosing intellectual property and by improperly using intellectual property it agreed would be used only for large-diameter connections as part of Grant Prideco's development of smaller-diameter connections." Id. ¶ 81. The complaint described various actions by Grant Prideco that constituted the alleged breaches of the confidentiality provisions of the Wedge Agreement. Id. ¶¶ 75-80.

According to the complaint, the foregoing activities by Grant Prideco constituted "a material breach of the Wedge Agreement and ended Grant Prideco's field-of-use license to Hydril's patents, trade secrets, and know-how." Id. ¶¶ 84-85. Thus, Hydril alleges, as a result of the termination of the Wedge Agreement, Grant Prideco's actions infringed Hydril's '467 patent. Id. ¶¶ 87-91.

D. <u>The District Court Decision</u>. In two separate opinions, the district court dismissed the antitrust and patent claims for failure to state a valid claim for relief, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

In dismissing the antitrust claim, the district court held that "[b]ecause Hydril has failed to allege enforcement activity by Grant Prideco which would create an objectively reasonable apprehension that Grant Prideco intended to enforce the '631 Patent against Hydril, Plaintiffs have failed to allege the minimum level of enforcement necessary to state a <u>Walker Process</u> claim against Grant Prideco." <u>Hydril Co., L.P. v. Grant Prideco, L.P.</u>, 385 F. Supp. 2d 609, 612 (S.D. Tex. 2005) ("<u>Hydril II</u>"). The court stated that neither plaintiff "alleges enforcement activity by Grant Prideco which would create an objectively reasonable apprehension that Grant Prideco might sue Hydril for patent infringement"; and that "the January 2003 letter to OMSCO does not contain an explicit threat or other language which, under the totality of the circumstances, could create a reasonable apprehension on Hydril's part that Grant Prideco might sue it for patent infringement. There is no allegation that any similar letters sent by Grant Prideco or its counsel to others in the pipe and drilling industry were more explicit or otherwise indicated Grant Prideco's intention to enforce the '631 patent against Hydril or others." <u>Id.</u> at 611-12.

The district court dismissed the patent claim on the ground that, in a provision of the 1997 merger agreement between Hydril and Grant Prideco (Section 12.12, discussed in Part III below), the parties waived the right to sue for patent infringement "relating to this agreement" and provided only a breach of contract remedy for such claims. <u>Hydril Co., L.P. v. Grant Prideco, L.P.</u>, No. Civ.A. H-05-0337, 2005 WL

1515422, at *3 (S.D. Tex. June 22, 2005) ("Hydril I").  It concluded that "Hydril agreed in § 12.12(a) of the Merger Agreement to waive its right to enforce its statutory rights in the '467 Patent against Grant Prideco."  Id. at *4

Finally, the district court declined to exercise "supplemental jurisdiction" over the "state law breach of contract claim," which it denied without prejudice to the plaintiffs refiling it in state court.  Hydril II at 612.

II

A.  In Walker Process, the Supreme Court "concluded that the enforcement of a patent procured by fraud on the Patent Office may be violative of § 2 of the Sherman Act provided the other elements necessary to a § 2 case are present."  382 U.S. at 174. It stated that Walker Process "alleged that Food Machinery obtained the patent by knowingly and willfully misrepresenting facts to the Patent Office.  Proof of this assertion would be sufficient to strip Food Machinery of its exemption from the antitrust laws" that the patent provided.  Id. at 177.  The Court pointed out that "[t]o establish monopolization or attempt to monopolize . . . under § 2 of the Sherman Act, it would then be necessary to appraise the exclusionary power of the illegal patent claim in terms of the relevant market for the product involved."  Id.

This court has "consistently explained that Walker Process fraud is a variant of common law fraud," "and that the elements of common law fraud include:  (1) a representation of a material fact, (2) the falsity of that representation," and "(3) the intent to deceive or, at least, a state of mind so reckless as to the consequences that it is held to be the equivalent of intent (scienter)."  Unitherm Food Sys. Inc., v. Swift-Eckrich, Inc.,

375 F.3d 1341, 1358 (Fed. Cir. 2004) (citations omitted), <u>rev'd on other grounds</u>, 126 S. Ct. 980 (2006).

As noted, Hydril's complaint alleged that Grant Prideco had fraudulently obtained its '631 patent by "fail[ing] to disclose to the USPTO material prior art of which [it] was aware" (which the complaint described) and that "[t]he '631 Patent as issued would not have been granted to Grant Prideco had Grant Prideco not omitted from its disclosures such known information on the prior art." If Hydril can prove these allegations, they would ground a claim of monopolization in violation of § 2 of the Sherman Act because they "would be sufficient to strip [Grant Prideco] of its exemption from the antitrust laws" its patent would otherwise provide. <u>Walker Process</u>, 382 U.S. at 177 (footnote omitted).

The complaint alleges that Grant Prideco obtained its patent by knowingly and deliberately concealing from the Patent Office prior art that it knew would have resulted in a denial of its application. Since neither the patent application nor the prosecution history is before us, we cannot tell whether it is contended that in obtaining the patent Grant Prideco made affirmative misstatements to the Patent Office about the prior art. <u>Cf.</u> <u>Walker Process</u>, where the complaint "alleged fraud on the basis that Food Machinery had sworn before the Patent Office that it neither knew nor believed that its invention had been in public use in the United States for more than one year prior to filing its patent application when, in fact, Food Machinery was a party to prior use within such time." 382 U.S. at 174. In any event, the complaint's allegations here go far beyond a simple failure to disclose to the Patent Office prior art that the examiner would have deemed material.

Under our precedent, the conduct alleged in Hydril's complaint would constitute Walker Process fraud. Cf. Nobelpharma AB v. Implant Innovations, Inc., 141 F.3d 1059, 1070 (Fed. Cir. 1998) ("We agree that if the evidence shows that the asserted patent was acquired by means of either a fraudulent misrepresentation or a fraudulent omission and that the party asserting the patent was aware of the fraud when bringing suit, such conduct can expose a patentee to liability under the antitrust laws. We arrive at this conclusion because a fraudulent omission can be just as reprehensible as a fraudulent misrepresentation.").

B. The district court dismissed the antitrust claim because Hydril "failed to allege the minimum level of enforcement necessary to state a Walker Process claim against Grant Prideco," since it did not "allege enforcement activity by Grant Prideco which would create an objectively reasonable apprehension that Grant Prideco intended to enforce the '631 patent against Hydril." Hydril II at 612. It is unclear whether the defect the court discerned in Hydril's complaint was a failure to allege sufficient enforcement activity by Grant Prideco, i.e., such as would create a "reasonable expectation" that Grant Prideco would file patent infringement litigation, or a failure to threaten such activity against Hydril itself rather than against Hydril's customers. Neither ground, however, justifies dismissal of the complaint at what the district court described as the "very early stages" of the case. Id.

In relying on the enforcement ground, the district court noted our statement in Unitherm that "as a matter of Federal Circuit antitrust law, the standards that we have developed for determining jurisdiction in a Declaratory Judgment Action of patent invalidity also define the minimum level of 'enforcement' necessary to expose the

patentee to a <u>Walker Process</u> claim for attempted monopolization." <u>Id.</u> (citing <u>Unitherm</u>, 375 F.3d at 1358). To the extent the district court's ruling may have been based on Hydril's failure to allege threatened enforcement action against Hydril rather than against its customers, a valid <u>Walker Process</u> claim may be based upon enforcement activity directed against the plaintiff's customers. Threats of patent litigation against customers, based on a fraudulently-procured patent, with a reasonable likelihood that such threats will cause the customers to cease dealing with their supplier, is the kind of economic coercion that the antitrust laws are intended to prevent. A supplier may be equally injured if it loses its share of the market because its customers stop dealing with it than if its competitor directs its monopolistic endeavors against the supplier itself. Without customers, a supplier has no business.

Our recent decision in <u>Microchip Technology Inc. v. The Chamberlain Group</u>, 441 F.3d 936 (Fed. Cir. 2006), does not require a different conclusion. There we held that a district court did not have jurisdiction under the Declaratory Judgment Act to entertain a suit raising various patent issues, because the threats of enforcement litigation directed against the patentee's customers failed to satisfy the first part of our test for declaratory judgment jurisdiction—that "the declaratory plaintiff must establish . . . a reasonable apprehension that it will face a patent infringement suit if it commences or continues the activity at issue." <u>Id.</u> at 942. For the reasons previously given, we decline to extend that ruling to invalidate a <u>Walker Process</u> claim alleging threats of infringement litigation directed against a supplier's customers by the holder of a patent allegedly procured by fraud on the Patent Office. (This case does not present an occasion to address the Supreme Court's recent decision in <u>Medimmune, Inc. v. Genentech, Inc.</u>, No. 05-608,

2007 WL 43797 (S. Ct. Jan. 9, 2007), which dealt with the standard for determining when a declaratory judgment action satisfies the case-or-controversy requirement of the Declaratory Judgment Act.)

C. Grant Prideco contends that the district court's dismissal of the antitrust claim may be upheld on various other grounds, on which the district court did not rely. It contends that under Fifth Circuit antitrust law, which we apply in deciding non-patent antitrust questions, Unitherm, 375 F.3d at 1355, Hydril's antitrust claim fails for the following three additional reasons:

1. Hydril has not shown injury in fact because it alleges only exclusion from the international market, but not from the domestic market; does not allege that it made or sold an infringing product; and does not allege improper conduct "during the effective [time] period of the ['631] patent."

2. Hydril and Hydril U.K., are "remote parties" who cannot maintain the Walker Process claim.

3. Hydril has not alleged that the '631 patent gave Grant Prideco any market power in the relevant market.

Although we may affirm a district court judgment on any ground shown by the record, even though that was not the basis of the district court's decision, Lion Raisins, Inc. v. United States, 416 F.3d 1356, 1368 (Fed. Cir. 2005), that authority is discretionary, not mandatory. See Q Int'l Courier, Inc. v. Smoak, 441 F.3d 214, 220 n.3 (4th Cir. 2006) ("The defendants also argue several alternative grounds for affirmance. Although we are not precluded from addressing these arguments, we deem it more appropriate to allow the district court to consider them, if necessary, in the first instance

2006-1188                              12

on remand.").  In the present case, we decline to consider these additional grounds for affirmance because we conclude that they would be more appropriately addressed in the first instance by the district court.

The alternative grounds for affirmance appear to involve complex and difficult questions of Fifth Circuit antitrust law, which the parties sharply dispute and the answers to which may be far from clear.  The answers may require careful study of an already substantial record or even augmentation of that record.  The district court appears to be in the best position initially to resolve these issues and such resolution seems to be the best course to follow here.

III

The ability of Hydril to pursue its patent infringement claim turns primarily upon the meaning and application of § 12.12(a) of the Merger Agreement, which provides:

> Except for the rights and remedies expressly provided under this Agreement, each party waives any and all rights and remedies relating to this Agreement and the transactions contemplated hereby sounding in tort, fraud, misrepresentation, statute, warranty, constructive or resulting trust, equitable rescission, quantum meruit, implied contract, or injury outside this Agreement.  The sole basis for any right or remedy by any party against any other party and their respective representatives relating to this Agreement and the transactions contemplated hereby or thereby is a breach of contract (or specific performance) action for breach of this Agreement or the other documents referenced herein.

Another provision of the Merger Agreement, § 2.14, captioned: "Intellectual Property," includes the following statement:

> The consummation of the transactions contemplated by this Agreement will not result in the loss of any Intellectual Property, including any loss under the Wedge Thread License Agreement . . . .

Section 11.45 of the Merger Agreement defines "Intellectual Property" to "mean patents, patent rights . . . ."

The theory of Hydril's patent infringement claim is as follows: even if the Wedge Agreement authorized Grant Prideco to use Hydril's patented technology to make large diameter connections, Grant Prideco breached that agreement by using or permitting others to use that technology to make small diameter connections. The effect of Grant Prideco's breach was to terminate its license to use Hydril's patented technology. Grant Prideco therefore is subject to suit for patent infringement because, after the Wedge Agreement had terminated, Grant Prideco could no longer rely on the prior license it had to use Hydril's patented technology.

The district court rejected the argument on the ground that § 12.12 precluded any patent infringement suit for any claims "relating to the Agreement" and limited the parties remedy for such claims to actions for breach of contract. The court rejected Hydril's contention that in § 12.12 the parties did not waive "remedies for post-contractual conduct." Hydril I at *3. The court stated that the contractual language

> explicitly waives "any and all rights and remedies relating to [the Merger Agreement] and the transactions contemplated" thereby, including the licenses created by the Wedge Agreement. It specifically waives rights created by statute, which include patent rights. The waiver in § 12.12(a) includes any "injury outside" the Merger Agreement, so long as the injury relates to the Merger Agreement and the transactions contemplated thereby. . . . Hydril's patent infringement claim seeks to enforce statutory rights related to the Merger Agreement and the licenses contemplated by and created under the Merger Agreement. As a result, Hydril agreed in § 12.12(a) of the Merger Agreement to waive its right to enforce its statutory rights in the '467 Patent against Grant Prideco and the motion to dismiss the patent

infringement claim must be dismissed [sic; "dismissed" should be "granted"].

Id. at *3-*4.

It is doubtful whether § 12.12(a) even covers patent infringement claims. That section's proscription of other remedies in favor of breach-of-contract claims lists 11 specific types of conduct it covers: "tort, fraud, misrepresentation, statute, warranty, constructive or resulting trust, equitable rescission, quantum meruit, implied contract, or injury outside this Agreement." These appear to be the types of claims that traditionally arise out of the performance of a contract or its breach. A claim for patent infringement, however, stems from and is based upon the patent laws, not particular contractual provisions.

In view of the length and detail relating to all aspects of the merger set forth in the Merger Agreement, the text of which occupies 47 pages of the joint appendix, one would think that if the parties intended to preclude patent infringement suits, they would explicitly have so provided. The single reference to "statute" in § 12.12 as one of the 11 categories of covered claims is a weak foundation upon which to ground an exclusion of patent litigation. Moreover, such exclusion of patent litigation, which often is essential to protecting patent rights, seems inconsistent with the statement in § 2.14 of the Merger Agreement quoted above that "[t]he consummation of the transactions contemplated by this Agreement will not result in the loss of any Intellectual Property." Although in other contexts patent infringement sometimes has been referred to as a tort (see, e.g., A.C. Aukerman Co. v. R.L. Chaides Construction Co., 960 F.2d 1020, 1031 (Fed. Cir. 1992)), the term "tort" in § 1212(a) cannot properly be read to cover a claim for patent infringement.

We need not decide, however, whether § 12.12 initially barred Hydril from suing for patent infringement because, whether or not it did, we do not read it as imposing such preclusion after the Wedge Agreement and the licenses had terminated. Section 12.12 governs "rights and remedies relating to the Agreement and the transactions contemplated hereby" and provides that the "sole basis for any right or remedy by any party against any other party relating to this Agreement and the transactions contemplated hereby or thereby is a breach of contract . . . action . . . ."

Once the Wedge Agreement license has been terminated (as the complaint alleges occurred), however, a claim for patent infringement that occurred after the termination is not one "relating to this [Merger] Agreement and the transactions contemplated therein." The claim is one that arises solely under the patent statute. Grant Prideco's prior authorization under the terminated license in the Wedge Agreement to use Hydril's patented technology is irrelevant to that claim.

IV

After dismissing the antitrust and patent infringement claims, the district court dismissed the remaining state breach-of-contract claim (which included a request for a declaratory judgment that the Wedge Agreement had been terminated), Pls.' 2nd Am. Compl. ¶¶ 83-85, because it declined to exercise supplemental jurisdiction over that claim. In light of our reversal of the dismissal of the federal claims, presumably the district court will want to reinstate the state law claim. In any event, the court should have the opportunity to do so. We therefore vacate the dismissal of the state law claims.

To avoid any possible misunderstanding of our narrow decision, we point out (perhaps unnecessarily) that in reversing and remanding we neither express nor intimate any view on the remaining issues in this case. We hold only that, in response to a motion to dismiss under Rule 12(b)(6), the district court should not have dismissed the Sherman Act and patent infringement claims.

## CONCLUSION

The judgment of the district court is reversed insofar as it dismissed the antitrust and patent claims, and vacated insofar as it dismissed the state-law claims. The case is remanded to that court for further proceedings consistent with this opinion.

## REVERSED IN PART, VACATED IN PART, AND REMANDED

# United States Court of Appeals for the Federal Circuit

2006-1188

HYDRIL COMPANY LP,
and HYDRIL U.K. LTD.,

Plaintiffs-Appellants,

v.

GRANT PRIDECO LP and GRANT PRIDECO, INC.,

Defendants-Appellees,

and

ATLANTIC RICHFIELD COMPANY,

Defendants.

MAYER, Circuit Judge, dissenting.

Because Hydril did not have standing to bring either an antitrust claim with respect to the finished drill pipe market, or a claim for infringement of U.S. Reissue Patent No. 34,467, I respectfully dissent from the majority's decision to reverse the district court on those two issues.

A patent exempts its holder from the general prohibition against monopolies. Walker Process Equip., Inc. v. Food Mach. & Chem. Co., 382 U.S. 172, 177 (1965) (citing Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co., 324 U.S. 806, 816 (1945)). However, Walker Process protects against the misuse of a fraudulent patent by "stripping" the patentee of this exemption and opening the door to a potential

antitrust claim.  Id.  Without the protection of this antitrust exemption, the holder of a fraudulently obtained patent will be liable for treble damages if its actions created a "reasonable apprehension" that it intended to enforce the patent against either the plaintiff or the plaintiff's customers.  See Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc., 375 F.3d 1341, 1358 (Fed. Cir. 2004), rev'd on other grounds, 126 S. Ct. 980 (2006).  To determine whether such a reasonable apprehension exists, it is "necessary to appraise the exclusionary power of the illegal patent . . . in terms of the relevant market for the product involved."  Walker Process, 382 U.S. at 177.  The exclusionary power of any United States patent, however, is confined to the United States, including its territories and its possessions.  35 U.S.C. §§ 100(c), 154(a)(1).  Thus, as a matter of both law and logic, a "reasonable apprehension" of patent enforcement cannot exist where neither the plaintiff nor any of its customers may be subject to the exclusionary power of a patent.

That is the case here.  Despite being given two opportunities to amend its complaint, Hydril has not alleged that either it or its customers participated, attempted to participate, or intended to participate in the finished drill pipe market within the United States.  Rather, Hydril has alleged only that it competes with Grant Prideco in this market "outside the United States."  Second Amend. Compl. ¶15 ("Hydril does not manufacture raw pipe.  However, outside the United States, Hydril sometimes acts as . . . a distributor of finished drill pipe . . . ."); id. ¶ 17 ("[O]utside the United States, Hydril competes with Grant Prideco as a distributor of finished drill pipe directly to end-users."); id. ¶ 28 (alleging that Hydril sold finished drill pipe in 2001 to Azerbaijan International Oil Company, and submitted a quote to one potential customer in each of

Dubai, Australia, Russia, Indonesia, and Brazil, but making no mention of any participation or intent to participate in the finished drill pipe market within the United States). Because Hydril has not alleged that it competes in the finished drill pipe market within the United States, it could not have had a "reasonable apprehension" that Grant Prideco would – or could – enforce its U.S. Patent No. 6,244,631 against Hydril in the finished drill pipe market.

This is a question of law that should be resolved without any further ado, especially since the instant appeal is from a Rule 12(b)(6) motion to dismiss for failure to state a claim. It should be decided on the sufficiency of the pleadings, and is not dependant on the factual record of the case. Accordingly, rather than punt this question of law back to the district court, we should hold that Hydril does not have standing to bring a Walker Process antitrust claim with respect to the finished drill pipe market because it admittedly only competes with Grant Prideco in that market "outside the United States."

We should also affirm the dismissal of Hydril's claim that the '467 patent was infringed. The Merger Agreement clearly limits the parties' remedies to an action for breach of contract or specific performance. Merger Agreement, § 12.12(a). The majority says that the language of section 12.12(a) is irrelevant because the Merger Agreement and the associated licenses have already been terminated by breach. However, the majority explicitly admits that whether the Merger Agreement has been breached remains an open question. Ante at 15; see also Second Amend. Compl. ¶ 84 ("Hydril seeks a declaratory judgment that Grant Prideco's [actions were] a material breach of the Wedge Agreement and ended Grant Prideco's" rights under the

Agreement.); id. ¶ 85 (making allegations similar to ¶ 84). They also implicitly admit this point by vacating the dismissal of the state law claims for a declaratory judgment of breach sought in paragraphs 84 and 85 of Hydril's Second Amended Complaint. Therefore, the majority's holding that Hydril may sustain a claim for patent infringement because the Merger Agreement has previously been terminated by breach is discordant with Hydril's own pleadings and position.

Section 12.12 clearly says that the parties agreed to waive "any and all rights and remedies relating to this Agreement and the transactions contemplated hereby sounding in," inter alia, "tort, . . . statute, . . . or injury outside this agreement." They also clearly agreed that "[t]he sole basis for any right or remedy by any party against any other party . . . relating to this Agreement and the transactions contemplated . . . thereby is a breach of contract (or specific performance) action for breach of this Agreement." Patent rights are statutory rights, and a claim for patent infringement sounds in tort; the right to sue for such injuries was waived by the Merger Agreement. Moreover, these rights "relate to" the Merger Agreement, and are, in fact, the reason the agreement was consummated in the first place. Accordingly, the district court correctly dismissed Hydril's infringement action for failure to state a claim because its exclusive remedy under the Merger Agreement lies, if at all, in an action for breach of contract.