# United States Court of Appeals for the Federal Circuit

2007-3050

TERESA C. CHAMBERS,

Petitioner,

v.

DEPARTMENT OF THE INTERIOR,

Respondent.

Richard E. Condit, Public Employees for Environmental Responsibility, of Washington, DC, argued for petitioner. With him on the brief was Mick G. Harrison, Caldwell Environmental Center, of Bloomington, Indiana.

Hillary A. Stern, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for respondent. On the brief were Peter D. Keisler, Assistant Attorney General, Jeanne E. Davidson, Director, and Todd M. Hughes, Deputy Director.

Elaine D. Kaplan, Senior Deputy General Counsel, National Treasury Employees Union, of Washington, DC, for amicus curiae, National Treasury Employees Union. With her on the brief was Gregory O'Duden, General Counsel.

Appealed from: Merit Systems Protection Board

# United States Court of Appeals for the Federal Circuit

2007-3050

TERESA C. CHAMBERS,

Petitioner,

v.

DEPARTMENT OF THE INTERIOR,

Respondent.

Petition for review of the Merit Systems Protection Board in DC1221040616-W-1 and DC0752040642-I-1.

_____

DECIDED:  February 14, 2008

_____

Before MAYER, DYK, and PROST, <u>Circuit Judges</u>.

Opinion for the court filed by <u>Circuit Judge</u> PROST.  Opinion dissenting-in-part filed by <u>Circuit Judge</u> MAYER.

PROST, <u>Circuit Judge</u>.

Teresa Chambers petitions for review of an adverse decision of the Merit Systems Protection Board ("MSPB" or "Board").  <u>Chambers v. Dep't of the Interior</u>, DC1221040616-W-1, DC0752040642-I-1 (M.S.P.B. Sept. 21, 2006) ("<u>Board Decision</u>"). We find no error with the portion of Board's decision affirming the administrative judge's findings and conclusions on the charges of misconduct and the penalty imposed, and therefore we affirm-in-part.  Because the Board, however, applied an incorrect standard

to determine if Chambers made a protected disclosure under the Whistleblower Protection Act, we remand for reconsideration under the correct standard.

BACKGROUND

Chambers served as Chief of the United States Park Police, a component of the National Park Service ("NPS"), from February 10, 2002, until she was removed on July 9, 2004. The NPS acts as a sub-agency of the Department of the Interior ("DOI" or "the agency"). In 2003, the Office of Management and Budget ("OMB") decided not to seek increases in the Park Police budget. Dissatisfied with that decision, Chambers spoke with a reporter from The Washington Post and also with a United States House of Representatives ("House") Interior Appropriations Subcommittee staffer about the budget and its implications for the Park Police. The newspaper then published an article attributing several statements regarding the budget to Chambers, prompting Chambers's supervisor, Donald Murphy, to first restrict Chambers from further communication with the press and then to place her on administrative leave pending review.

On December 17, 2003, Murphy proposed to remove Chambers from service based on six charges of misconduct. Chambers, in response, filed a complaint with the Office of Special Counsel ("OSC"), claiming reprisal for a protected disclosure, and also appealed the proposed removal and her administrative leave. After the deciding official sustained all six charges of misconduct and effectuated the removal, Chambers's filed another appeal with the Board.

On appeal, the administrative judge sustained four of the original six charges: Charge 2—making public remarks regarding security on the federal mall, in parks, and

on the parkways in the Washington, D.C., metropolitan area; Charge 3—improperly disclosing budget deliberations to a Washington Post reporter; Charge 5—three specifications of failing to carry out a supervisor's instructions; and Charge 6—failing to follow the chain of command. The administrative judge also found Chambers had not made a protected disclosure, and that the agency proved it would have taken the same action in absence of the alleged whistleblowing activity. The administrative judge then rejected Chambers's other defenses including reprisal for filing a grievance, violation of First Amendment rights, and violations of due process. Finally, notwithstanding that she sustained only four of the six charges of misconduct, the administrative judge found the agency would have imposed the same penalty of removal.

Over a dissent by one Board member, the Board affirmed the administrative judge's decision.[1] First, it affirmed the sustained charges, deferring to the administrative judge's credibility determinations. Board Decision, slip op. at 7. Next, it addressed Chambers's whistleblowing defense. The Board agreed with the administrative judge that Chambers did not make a protected disclosure and specifically addressed four disclosures: (1) a November 3, 2003 conversation with the House staffer, (2) a November 20, 2003 interview with the Washington Post reporter, (3) a December 2, 2003 letter to the Director of the NPS, and (4) a December 2, 2003 email to the House staffer. Id., slip op. at 8–18.

---

[1] Dissenting Board Member Sapin would not have sustained the charges of misconduct, would not have affirmed the administrative judge's conclusion that the agency would have taken the same action in the absence of a protected disclosure, and would have concluded that Chambers did make protected disclosures.

As to the conversation Chambers had with Ms. Weatherly, the House staffer, the Board concluded that Chambers had not revealed any information to Ms. Weatherly by raising objections regarding NPS payment for a study requested by the House to evaluate the NPS's compliance with National Academy of Public Administration ("NAPA") recommendations. Id., slip op. at 9. The Board looked to its standard that a gross waste of funds requires "more than debatable expenditure that is significantly out of proportion to the benefit reasonably expected to accrue to the government." Van Ee v. EPA, 64 M.S.P.R. 693, 698 (1994) (quoting Nafus v. Dep't of the Army, 57 M.S.P.R. 386, 393 (1993)). In light of the assessed importance of the report to the House appropriators, the Board concluded that it could not constitute a gross waste of funds. Board Decision, slip op. at 9.

Next, considering Chambers's interview with the Washington Post reporter, which led to an article published on December 2, 2003, the Board concluded that Chambers raised a "policy disagreement over which reasonable minds might differ," and therefore did not make a protected disclosure. Id., slip op. at 13. In so concluding, the Board stated that a "policy disagreement can serve as the basis for a protected disclosure only if the legitimacy of a particular policy choice 'is not debatable among reasonable people.'" Id. (quoting White v. Dep't of the Air Force, 391 F.3d 1377, 1382 (Fed. Cir. 2004). It applied that standard to Chambers's interview with the reporter, which Chambers alleged demonstrated her disclosure of a substantial and specific danger to public health or safety, of gross mismanagement, of an abuse of authority, or of a gross waste of funds. The Board found no disclosure of a substantial and specific danger to public health or safety because evidence instead revealed disclosure of a

"disagreement with considered judgments reached by policymakers after extensive study and discussion." Board Decision, slip op. at 14. Further, the Board concluded that Chambers did not disclose gross mismanagement, an abuse of authority, or a gross waste of funds, because she only challenged decisions about the Park Police's role and sufficiency of funding. Id., slip op. at 15–16.

The Board then considered Chambers's letter to the director of the National Park Service, Ms. Mainella. In the letter, Chambers complained to Mainella that Chambers's supervisor, Mr. Murphy, had "slandered" her and had disclosed a letter of reprimand that he had promised to keep confidential. Id., slip op. at 16. The Board did not find an abuse of authority in either of the alleged wrongdoings. Id., slip op. at 16–17.

Finally, the Board turned to an email Chambers sent to House staffer Weatherly the same day the Washington Post published its article about the Park Police. Because the email contained the same statements made to the reporter, the Board reached the same conclusion that the disclosure did not amount to a protected disclosure. Id., slip op. at 17–18.

The Board further considered Chambers's other arguments and concluded that she had failed to make a First Amendment defense and that the administrative judge correctly concluded that the penalty of removal was reasonable. Id., slip op. at 18–22. Chambers timely appealed to this court.

DISCUSSION

We have jurisdiction over petitions for review of MSPB decisions under 28 U.S.C. § 1295(a)(9), pursuant to the procedures in 5 U.S.C. § 7703. We must set aside agency actions, findings, or conclusions we find "(1) arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with law; (2) obtained without procedures required by law, rule, or regulation having been followed; or (3) unsupported by substantial evidence . . . ."  5 U.S.C. § 7703(c).

On appeal, Chambers argues that the Board erred by denying her claim that, by removing her from service, the agency acted in retaliation for a protected disclosure by Chambers.  Specifically, she alleges that a number of her actions constitute disclosure of substantial and specific dangers to public safety under the Whistleblower Protection Act, 5 U.S.C. § 2302(b)(8) ("WPA").  Further, the National Treasury Employees Union, as amicus curiae, argues that the Board applied an incorrect and overly narrow standard for what constitutes a protected disclosure of a risk to public health or safety.

Chambers also contests the Board's decision to sustain charges 2, 3, 5, and 6. According to her, the agency presented insufficient evidence to sustain the charges, particularly where Chambers did not violate an existing policy.  She further alleges procedural errors by the agency and the administrative judge, including allowing ex parte communications prior to her removal, concealment of the agency's findings, and erroneous evidentiary rulings by the administrative judge.  Finally, Chambers argues that the Board and administrative judge erred in concluding that removal was a proper penalty.

I

To prevail on a claim under the WPA, an employee must show that she disclosed information she reasonably believed "evidences (i) a violation of law, rule, or regulation, or (ii) gross mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety."  5 U.S.C. § 2302(b)(8)(A);

see Reid v. Merit Sys. Prot. Bd., 508 F.3d 674, 678 (Fed. Cir. 2007) (concluding that, to make a protected disclosure, a whistleblower need only disclose what he reasonably believes is an imminent—not actual—violation of law, rule, or regulation).

With respect to the denial of her claims under the WPA, Chambers only challenges the Board's conclusion regarding her alleged disclosure of a danger to public safety. Specifically, she and the amicus point to the disclosures to the Washington Post reporter and the House staffer. According to Chambers, she disclosed information she reasonably believed identified substantial and specific dangers to public safety, and the agency removed her in response. She argues that the Board applied an erroneous standard when reviewing the administrative judge's decision, and therefore reached the wrong conclusion with respect to her disclosures.

We agree with Chambers and the amicus that the Board applied an incorrect standard when evaluating her WPA claim relating to disclosure of a risk to public safety. In our view, the Board improperly blended the concepts of gross mismanagement and risk to public safety.

The Board considered Chambers's disclosures under the standard from White, 391 F.3d at 1382. Board Decision, slip op. at 12–14. Where the Board considered whether Chambers's disclosures evidenced gross mismanagement, White does provide the applicable standard. As discussed in White, a lawful but problematic policy constitutes gross mismanagement when reasonable people could not debate the error in the policy. 391 F.3d at 1382. But White concerned only gross mismanagement, not a danger to public health or safety. Id. at 1381.

The Board failed to distinguish disclosures of a danger to public health or safety from allegations of gross mismanagement. In particular, it applied the White standard to "a statement that a particular policy choice raises risks to the citizenry." Board Decision, slip op. at 13. While Chambers certainly expressed a disagreement with a policy decision, she also potentially disclosed a danger to public safety that may have resulted from that decision. The Board classified "[t]he personal opinions that [Chambers] shared with the newspaper reporter and congressional staffer regarding the funding level and priorities consciously set by policymakers for her agency," as different from disclosures of a danger to public safety, id., slip op. at 15; but Chambers's opinions about the consequences of the policy decisions could have disclosed a danger to public safety. The Board should have considered those aspects of Chambers's disclosures directed to public safety and determined if she disclosed information she reasonably believed evidenced a substantial and specific danger to public safety.

The nature of Chambers's disclosure reveals the difficulty encountered by the Board. Law enforcement activities generally serve to increase public safety. The budget provided for law enforcement, however, limits the extent of protection. Allocating the budget to different aspects of law enforcement necessarily balances the risks and benefits affected; this balancing represents a quintessential management decision. Any such policy decision related to the allocation or distribution of law enforcement funding, therefore, could potentially be said to create a risk to public safety. See id., slip op. at 1, (Sapin, dissenting). Perhaps the Board's implicit recognition of this overlap led it to consider Chambers's disclosures exclusively as a dispute over policy rather than revealing a danger to public safety. Id., slip op. at 12–14.

The WPA, however, addresses disclosure of dangers to public health or safety separately from gross mismanagement. That under certain circumstances those concepts might overlap in the context of law enforcement does not change the fact that the statute creates two distinct standards. In other words, Congress did not intend, in our view, to categorically classify any danger arising from law enforcement solely as a policy issue, to which the standard for gross mismanagement would apply.

Certain parameters help define disclosure of a danger to public health or safety. The often-quoted legislative history, a Senate Report from the Committee on Governmental Affairs, provides examples of which disclosures fall within the statute:

> [G]eneral criticism by an employee of the Environmental Protection Agency that the Agency is not doing enough to protect the environment would not be protected under this subsection. However, an allegation by a Nuclear Regulatory Commission engineer that the cooling system of a nuclear reactor is inadequate would fall within the whistle blower protections.

S. Rep. No. 95-969, at 21 (1978). The Board has interpreted that statement, stating that "revelation of a negligible, remote, or ill-defined peril that does not involve any particular person, place, or thing, is not protected." Sazinski v. Dep't of Housing & Urban Dev., 73 M.S.P.R. 682, 686 (1997). Our court has held that the disclosure of a danger only potentially arising in the future is not a protected disclosure. Herman v. Dep't of Justice, 193 F.3d 1375, 1379 (Fed. Cir. 1999). Rather, the danger must be substantial and specific. Id.

A variety of factors guide the application of the statutory language, helping determine when a disclosed danger is sufficiently substantial and specific to warrant protection under the WPA. One such factor is the likelihood of harm resulting from the danger. If the disclosed danger could only result in harm under speculative or

improbable conditions, the disclosure should not enjoy protection. Another important factor is when the alleged harm may occur. A harm likely to occur in the immediate or near future should identify a protected disclosure much more than a harm likely to manifest only in the distant future. Both of these factors affect the specificity of the alleged danger, while the nature of the harm—the potential consequences—affects the substantiality of the danger.

As noted, while the Board concluded that Chambers did not disclose a substantial and specific danger to public health or safety, it did so after analyzing her claims under an incorrect standard—the test applicable to disclosures of gross mismanagement. Board Decision, slip op. at 13–14. Because the Board is best suited to analyze Chambers's disclosures in the first instance under the correct standard, we vacate and remand. See Hydril Co. LP v. Grant Prideco LP, 474 F.3d 1344, 1351 (Fed. Cir. 2007); Medrad, Inc. v. Tyco Healthcare Group LP, 466 F.3d 1047, 1053 (Fed. Cir. 2006).

II

Chambers also challenges the Board's decision affirming the administrative judge's findings and conclusions, which sustained four of the agency's charges of misconduct. Specifically, Chambers alleges that certain charges against her—making public remarks regarding security, failing to follow the chain-of-command, and disclosing budget deliberations—were based on activity the agency did not explicitly prohibit, and therefore cannot support a charge of misconduct. The agency responds that no formal rules are required, but rather that the agency must only demonstrate a nexus to "efficiency of the service."

The cases Chambers looks to for support, Ahles v. Department of Justice, 768 F.2d 327 (Fed. Cir. 1985), and Wise v. United States, 603 F.2d 182 (Ct. Cl. 1979), involved misconduct charges of intentional fraud.  By contrast, the agency here charged Chambers with revealing sensitive information or otherwise violating norms of conduct, charges that do not require the government to show bad intent.  The government must demonstrate only that Chambers violated norms of conduct for her position, such that the agency's action promotes the efficiency of the service.  Levick v. Dep't of the Treasury, 75 M.S.P.R. 84, 90 (1997) (quoting Fontes v. Dep't of Transp., 51 M.S.P.R. 655, 663 (1991)).

The administrative judge determined that Chambers did reveal information about security and either did understand or should have understood it to be sensitive, in part because it was labeled "law enforcement sensitive."  Further, the administrative judge found that Chambers improperly disclosed budget information even though she knew the agency prohibited her from doing so.  Specifically, the administrative judge rejected Chambers's testimony, and relied on that of her supervisor and other agency officials.

The agency also charged Chambers with failure to carry out her supervisor's instructions for (1) failing to detail Pamela Blyth, (2) failing to require two of her deputy chiefs to take medical examinations, and (3) failing to cooperate with the Department of Interior's Solicitor's office.  The administrative judge sustained all of the specifications.

The Board affirmed all of the administrative judge's findings and conclusions, relying on undisputed facts and the administrative judge's credibility determinations.  Board Decision, slip op. at 7.  We find no error in the Board's conclusion.  Indeed, credibility determinations are "virtually unreviewable" at this level.  Hambsch v. Dep't of

the Treasury, 796 F.2d 430, 436 (Fed. Cir. 1986).  Because substantial evidence supports the administrative judge's and the Board's findings and conclusions, we affirm that aspect of the decision.

III

Before this court, Chambers also alleges that the Board erred by sustaining the charges despite substantial procedural defects by the agency; the Board did not discuss these alleged defects.  Specifically, she raises interviews that the deciding official, Mr. Hoffman, conducted with five other agency employees.  The administrative judge found that Hoffman obtained no new and material information via the interviews or any other ex parte contact.

As this court stated in Stone v. FDIC, considerations when analyzing whether an ex parte contact constitutes a due process violation include:

> whether the ex parte communication merely introduces "cumulative" information or new information; whether the employee knew of the error and had a chance to respond to it; and whether the ex parte communications were of the type likely to result in undue pressure upon the deciding official to rule in a particular manner.  Ultimately, the inquiry of the Board is whether the ex parte communication is so substantial and so likely to cause prejudice that no employee can fairly be required to be subjected to a deprivation of property under such circumstances.

179 F.3d 1368, 1377 (Fed. Cir. 1999).

The administrative judge here explicitly considered the Stone factors in reaching her conclusion that the agency did not violate Chambers's due process rights.  Although the interviews occurred without Chambers's presence and the agency did not provide her with transcripts until her appeal, the administrative judge found that the interviews did not develop new and material information, and that they did not exert any pressure on Mr. Hoffman to reach his conclusion.  While Chambers argues before us that the

administrative judge did not properly analyze the facts of her case, we find no problem in the administrative judge's analysis. She considered the correct standard of law and the alleged violations, and concluded the agency had not violated Chambers's due process rights.

Similarly, Chambers has not identified any consequence of the other asserted procedural errors to her case. We leave discovery and evidentiary issues to the "sound discretion of the board and its officials," and "will not overturn the board on such matters unless an abuse of discretion is clear and is harmful." Curtin v. Office of Pers. Mgmt., 846 F.2d 1373, 1378 (Fed. Cir. 1988). Accordingly, we affirm the Board's decision to the extent it rejected Chambers's claim of due process or other procedural violations.

IV

The Board concluded that, as the head of a law enforcement agency, Chambers held a large amount of trust; therefore, removal was a reasonable penalty in light of Chambers's repeated violation of that trust. We find no error in the Board's conclusion and therefore affirm that aspect of the Board's decision.

CONCLUSION

Because the Board applied an incorrect standard when evaluating Chambers's claim that the agency removed her in reprisal for a protected disclosure under the WPA, we vacate and remand for application of the correct standard, as explained above. As to all other aspects of the Board's decision, however, we affirm.

COSTS

No costs.

AFFIRMED-IN-PART, VACATED-IN-PART, AND REMANDED-IN-PART

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

2007-3050

TERESA C. CHAMBERS,

Petitioner,

v.

DEPARTMENT OF THE INTERIOR,

Respondent.

Petition for review of the Merit Systems Protection Board in DC1221040616-W-1 and DC0752040642-I-1.

MAYER, <u>Circuit Judge</u>, dissenting-in-part.

I would affirm the decision sustaining Teresa Chambers' removal and denying her request for corrective action. Because the board adequately considered whether her disclosures to a newspaper reporter and congressional staffer reasonably evidenced "a substantial and specific danger to public health or safety", 5 U.S.C. § 2302(b)(8)(A) (2000), and concluded they did not, there is no reason to remand the case for reconsideration.

The relevant questions are (1) whether Chambers believed her disclosures evidenced a substantial and specific danger to public health or safety, and (2) whether that belief was reasonable. To prevail on a Whistleblower Protection Act ("WPA") claim under any category of protected disclosures, an employee must meet the objective "reasonable belief" test: "could a disinterested observer with knowledge of the essential facts known to and readily ascertainable by the employee reasonably conclude that the actions of the government evidence gross mismanagement," a gross waste of funds, an

abuse of authority, or a substantial and specific danger to public health or safety? See Lachance v. White, 174 F.3d 1378, 1381 (Fed. Cir. 1999) (discussing the reasonable belief standard in the context of a gross mismanagement claim). Whistleblower protection in the public health or safety category only attaches to disclosures where the perceived public danger could reasonably be seen by a disinterested observer as substantial and specific.

To be sure, "gross mismanagement" and "substantial and specific danger to public health or safety" are discrete categories of protected disclosures under the WPA. And the board conflated them when it implied that disclosures of considered policy judgments are not protected under the public health or safety prong unless the legitimacy of the policy choice is "not debatable among reasonable people." White v. Dep't of the Air Force, 391 F.3d 1377, 1382 (Fed. Cir. 2004) (relating the standard for the gross mismanagement category of whistleblower protection). The public health or safety analysis focuses on whether the danger is objectively "specific" and "substantial," not whether it has been carefully studied and discussed by policymakers. If a legitimate policy decision nevertheless raises substantial and specific dangers to public health or safety, employees may disclose them without fear of reprisal.

If the board had not decided the central issue, it would have had no occasion to contrast and compare this case with Braga v. Department of the Army, 54 M.S.P.R. 392, 398 (1992), "where a clothing designer disclosed a substantial and specific danger to public health or safety when he reported that the real-world threat levels from anti-personnel mines greatly exceeded the threat levels he had been asked to design body armor systems to meet, and that soldiers relying on that armor for protection would

therefore be in grave danger of being killed or maimed." <u>Chambers v. Dep't of the Interior</u>, DC1221040616-W-1, DC0752040642-I-1, slip op. at 8 (M.S.P.B. Sept. 21, 2006). Whereas in <u>Braga</u>, disclosures of "actual," "real-world," direct danger from land mines to workers clothed in insufficient body armor were substantial and specific, Chambers' disclosures of her speculative concerns for public safety from unnamed, unidentified, hypothetical criminal actors were patently unspecific. This lack of specificity was fatal to her whistleblower claim. As the majority points out: "Our court has held that the disclosure of a danger only potentially arising in the future is not a protected disclosure." <u>Ante</u> at 9 (citing <u>Herman v. Dep't of Justice</u>, 193 F.3d 1375, 1379 (Fed. Cir. 1999)).

This case does present an opportunity to clarify the meaning of "substantial and specific danger to public health or safety" under the WPA, but I see no reason to remand. By explicitly discussing the facts in <u>Braga</u> that constituted a substantial and specific danger to public health or safety, and concluding that Chambers did not disclose such a danger within the meaning of the WPA, the board properly analyzed the relevant issue and arrived at the correct conclusion.

I agree with Parts II, III, and IV. Therefore, it would seem that even if on remand the board found Chambers' public safety related disclosures to be protected, her removal would stand because the agency would have taken the same personnel action in the absence of the alleged whistleblowing activity due to her "repeated violation of . . . trust" as head of a law enforcement agency. This included "various instances of misconduct; her lack of remorse and poor potential for rehabilitation; her prior discipline for her own misuse of a government vehicle and condonation of such misuse by a

subordinate; and the deciding official's justifiable loss of confidence that the appellant, if retained, would faithfully carry out her duties in accordance with the priorities set by Congress and higher-level executive branch officials." Chambers, slip op. at 13. In these circumstances, remanding the case to the board is merely an academic exercise.